Filed 9/22/16  Elias v. McJab, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| STEVEN ELIAS et al., | D068119 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2012-00093692-CU-BC-CTL) |
| MCJAB, INC., | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.


Freeland McKinley & McKinley, Steven A. McKinley and Karen G. McKinley for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Brian Slome and Jeffry A. Miller for Defendant and Respondent.

Plaintiffs and appellants Steven Elias (Steven) and Kirsten Elias (Kirsten), husband and wife (sometimes, plaintiffs or Eliases), appeal a judgment following a

defense verdict in favor of defendant and respondent McJab, Inc. (McJab). At the conclusion of a two-week trial, the jury found that McJab real estate agent Jason Mullaney (Mullaney)[1] did *not* act within the course and scope of his agency with McJab in connection with the sale of plaintiffs' real property, when Mullaney misappropriated about $345,000 from plaintiffs.

On appeal, plaintiffs contend the court erred in allowing the jury to determine whether Mullaney was acting within the course and scope of his agency with McJab because at the time he misappropriated the sale proceeds, Mullaney allegedly was engaging in an activity for which a license was required and because McJab held that license after Mullaney left McJab. Plaintiffs further contend that, because Mullaney was McJab's agent when he misappropriated the sale proceeds, the "only substantial evidence shows that he was at that time engaged in the business for which he was employed[]" by McJab.

As we explain, we disagree with these contentions and affirm the judgment for McJab.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

John Conn (Conn) testified he started a business in 1998 for the purpose of helping buyers obtain single-family residential home loans. For the business, Conn obtained his

---

[1] Mullaney is not a party in this appeal.

[2] We " 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)

2

real estate broker's license. In 1998 or 1999, Conn's son-in-law, John Smyth (Smyth), took charge of the business. Once incorporated, McJab replaced another entity of Conn's, First California Funding (FCF), which then became a "dba" of McJab for loan originations.

In 2005, McJab went into the business of real estate sales. To do so, a second "dba" of McJab was formed, McJab Realty. Because FCF's customers tended to be other real estate sales companies and because Conn did not want to compete with FCF's best customers when McJab Realty was formed, McJab did "very few real estate transactions" through McJab Realty.

Mullaney was hired by McJab in about 2002. In 2007, McJab held Mullaney's real estate license, as it was obligated to do as a broker. McJab retained Mullaney's license until it expired in 2010.

McJab allowed its agents to establish their own corporations for the purpose of conducting business through McJab. Conn testified it was common for agents to do so for "tax advantages." Mullaney established "Trident Global Corporation" (TGC). Conn noted neither TGC nor "Trident Financial Holdings and Acquisitions" (TFHA), another of Mullaney's companies/businesses, was ever part of McJab. Rather, both businesses were wholly owned by Mullaney and were used by him to market to Navy SEALs, which use the "trident" as part of their insignia and where Mullaney obtained a "great deal" of business.

3

Conn testified Mullaney in February 2006 signed an "ethics and good practice agreement." That agreement required agents to " 'practice full disclosure, treat each client fairly, and provide professional mortgage advice to every client.' " It further provided, "No oral promises of any kind are permitted."

Smyth testified that he joined Conn in the family business in 1998. When initially hired by McJab, Mullaney worked as a loan officer and loan originator. At the end of 2007, when the real estate market was in a "terrible, terrible condition," Mullaney told Smyth he was "leaving the business" and was going into " 'hedge funds.' " When Mullaney stated he was "leaving the business," Smyth understood that to mean Mullaney was leaving the mortgage and real estate business "full time."

When he left McJab, Mullaney had only one active listing on the multiple listing service (MLS), which listing dated back to 2006 and which expired in July 2008. According to Smyth, this listing was located in an area that was "very heavily hit" by foreclosures when the market turned. Thus, while the listing was active, Smyth noted there was no activity on that property.

In early 2007, plaintiffs decided to purchase a home on Port of Spain Road in the Coronado Cays (Spain property). Plaintiffs chose Mullaney as their agent in connection with their purchase of the Spain property. Steven and Mullaney had met in the military in about 1992 in the Navy SEALs unit. As the years went by, Steven and Mullaney developed a friendship, as they both were stationed in Coronado. In about 2002 or 2003, Mullaney told Steven he was working for McJab Realty after retiring from the military.

4

In 2003, Steven hired Mullaney to help him refinance his townhouse in Carmel Valley. The refinance was done through FCF. Steven was happy with the service Mullaney provided. Steven subsequently sold the townhouse, and plaintiffs in 2003 bought a single family home in Carmel Valley. Although plaintiffs intended to use the Carmel Valley home as their residence, they also viewed the property as an "investment" because Steven wanted to purchase properties below market, remodel them and then sell them for a profit. In 2005, plaintiffs refinanced their Carmel Valley home, again using Mullaney and FCF.

Although the Spain property needed a lot of work, plaintiffs decided to purchase the home because it was closer to the base and because it looked like a good "project." Before making an offer, Steven spoke extensively with Mullaney about his plan to purchase and remodel the Spain property, then sell it in a few years. According to Steven, Mullaney knew at some point he also would be involved in the sale of the Spain property. Steven also told Mullaney that he was interested in purchasing other properties to refurbish.

In connection with the purchase of the Spain property, Steven in May 2007 signed a form titled "Confirmation Real Estate Agency Relationships," which also was signed by Mullaney. This form provided McJab Realty was "representing the [b]uyer exclusively."

Shortly after the Spain property escrow closed in December 2007, Mullaney recommended putting only Steven on the deed because Kirsten had just had a baby, and, according to Mullaney, it would make it easier to complete the transaction. Kirsten

5

agreed and signed an interspousal transfer grant deed. Over the next several months, Steven worked on the remodel of the Spain property, which was completed in about May 2008.

Upon completion of the remodel, Steven spoke to Mullaney about selling the Spain property because they could not afford to keep that property and their home in Carmel Valley, which they had been unable to sell because of the deteriorating real estate market. Remarkably, Mullaney advised Steven *not* to use the MLS to market the Spain property but rather suggested Steven just put a "for sale" sign on the property. Although Steven was not "happy" with that advice, he followed it because he trusted Mullaney.

Conn testified that Mullaney was working as a real estate agent for McJab in May 2007, when plaintiffs sought to *buy* the Spain property. Conn further testified that between January and July 2008, Mullaney never told him he was going to be the agent for, or otherwise advise, plaintiffs in connection with the *sale* of the Spain property; and that, to the extent Mullaney and Steven entered into an "oral agreement" for Mullaney to sell the property, even if Mullaney had still been working for McJab, such an agreement would have violated the independent contractor and ethics and good faith practice agreements McJab agents then were required to sign.

Smyth testified he routinely checked the MLS to determine whether agents listed property for sale through McJab Realty. Using an agent's MLS number, Smyth could verify a listing and ensure its accuracy. In 2007 and 2008, Smyth used Mullaney's MLS number to verify Mullaney's listings (or lack thereof). Smyth testified that, during this

6

time period, he checked the MLS about once a week; that the only listing that came up under Mullaney's MLS number was for the property that was in the area heavily hit by foreclosures, which listing properly named McJab Realty as the agent; and that the Spain property was never listed on the MLS.

Smyth further testified he had no knowledge of Mullaney doing any other "real estate deals" after December 2007, when Mullaney told Smyth he was leaving the real estate business. At the end of 2009, or beginning of 2010, Mullaney returned to work for McJab for a short while to "get a couple of loans going."

As Mullaney advised, Steven put a "for sale" sign on the Spain property. Steven's sister sat at the first open house, as she was then living at the Spain property. On the first day of the open house, Nadar Zabaneh (Zabaneh) expressed interest in buying the Spain property. Mullaney was called, and, shortly thereafter, he arrived at the Spain property and began negotiating with Zabaneh. About a week later, Zabaneh made an offer to buy the Spain property. After further negotiations proved unfruitful, plaintiffs accepted the offer.

The record includes a May 20, 2008 email from Mullaney to escrow officer Janet Viloria (Viloria) of California Title Company regarding opening a "new escrow" for the sale of the Spain property. The email includes the TFHA logo at the bottom of the page and is signed "Jason Mullaney[,] President."

Steven testified that, after he accepted the offer, Mullaney brought some documents for Steven to sign. However, Mullaney did not go through the documents

7

with Steven as he had done in the past. Steven also did not read the documents but instead relied on Mullaney's "executive summary" of them.

One of the documents Steven signed was titled " 'General provisions.' " Steven initialed each of the four pages of this document and signed on the last page. This document was an agreement between Steven and Zabaneh to appoint California Title Company as the escrow holder for the sale of the Spain property. Steven also signed a document titled " 'California Title Company' " that showed he was agreeing to sell the Spain property to Zabaneh for $1.178 million; title instructions; and a document titled " 'Contingency Removal.' " The bottom of the one-page " 'Contingency Removal' " document listed Mullaney as the agent and McJab Realty as the broker.

However, Steven testified the handwritten initials placed in the "seller's" box on each of the seven pages of the eight-page residential purchase agreement that was submitted to escrow were not made by him, nor did he sign his name under "seller" on the last page of that agreement. He further testified the initials and signature of the seller on a document titled " 'Buyer's Inspection Advisory' " were not his, nor was he ever presented with this document. Steven also did not sign or receive a document titled " 'Wood Destroying Pest Inspection and Allocation of Cost Addendum,' " although his name was signed on this document as well.

Moreover, unlike the document titled "Confirmation of Real Estate Relationship" that Steven signed when plaintiffs purchased the Spain property in 2007, which stated McJab Realty represented the buyer "exclusively," Steven did not sign such a document

8

when he was in the process of selling that property. Steven testified he and Mullaney instead entered into an "oral agreement" in May 2007 providing that Mullaney would act as Steven's agent if and when Steven was ready to sell the Spain property. Steven further testified he knew then that there needed to be a written agreement between him and Mullaney if Mullaney was going to act as the agent in connection with the *sale* of the Spain property.

On May 26, 2008, Steven signed a document providing the proceeds from the sale of the Spain property would be deposited into his credit union account. Although the name of the credit union was listed on this document, the spaces to provide the account number and the routing number were blank. The record shows Steven's account information was subsequently added to this document, but not by Steven.

The record further shows the escrow instructions were supplemented to provide the sale proceeds from the Spain property were to be wired to a different bank and into the account of "Jason Mullaney -- Trident Financial Holdings & Acquisitions." The signature at the bottom of this supplemental instruction was Steven's, from the original document he signed and dated on May 26.

On or about June 18, 2008, the escrow wiring instructions were again supplemented. This time escrow was instructed to wire the proceeds from the sale of the Spain property into Mullaney's personal account, which account Mullaney opened specifically for this purpose. Although Steven's signature purportedly was included on the June 18 supplemental instruction, he testified it was not his.

9

In fact, Steven testified he and his family went to Switzerland for about a month on or about May 28, 2008, about two days after he initially had signed the escrow wiring instructions that provided the money would be deposited into his credit union account. While in Switzerland, escrow closed. However, shortly before the closing, Mullaney called Steven and told him the money was going to be wired into Mullaney's TGC account for "tax[]" reasons. Steven testified he was happy escrow was closing and was not "surprised" the money was going into a different account because Mullaney was his "broker."

When asked at trial what he understood the TGC account to be, Steven testified he thought it was a "trust account" controlled by McJab, Mullaney's "employer." Steven also testified that Mullaney "always" said he was the "broker for McJab Inc. and McJab Realty and [FCF]"; that Steven believed TGC was another company under McJab, like McJab Realty and FCF; but that Mullaney never told Steven the money was being wired into a McJab trust account.

In October 2008—a few months after the Spain property escrow closed, Steven transferred $25,000 to Mullaney. In his testimony, Steven referred to the $25,000 as both a loan to, and an investment in, one of Mullaney's companies involved in what Steven termed was a hard-lending business. According to Steven, that business involved loaning money against a tangible asset, including a car, real property or even a certificate of deposit. The caveat was the asset had to be "free and clear." Steven recalled Mullaney told him and others who also invested in this business that they could receive up to a 24

10

percent return on their investment. At another point, Mullaney told Steven he could make these hard-money loans "under some sort or Regulation D or some 506-something."

This was not the first time Steven had "loaned" and/or "invested" money in Mullaney's hard-lending business. In December 2007, Steven invested $40,000 with Mullaney. Under the agreement, Mullaney would repay the money in 30 or 60 days along with 7 or 10 percent interest. According to Steven, in January 2008 Mullaney timely repaid the money with interest.

Even before the Spain property sold, Mullaney asked Steven to invest a portion of the proceeds from that sale into Mullaney's hard-lending business. As escrow was about to close on the Spain property, Steven and Mullaney again discussed Steven investing a portion of the proceeds from that sale into Mullaney's loan business. Steven testified that they never agreed on an amount to invest but that he and his wife at some point intended to make such an investment.

With respect to the $25,000 Steven transferred to Mullaney in October 2008, Steven testified their agreement required Mullaney to repay the money in 30 days at 7 or 10 percent interest. Steven knew Mullaney intended to use the $25,000 payment to make "hard-money" loans. In December 2008, Steven asked Mullaney about repayment of the $25,000. Mullaney's email response stated he was waiting for others to pay him, that it would all be " 'taken care of this week' " and that he would "make it up Steven and Kirsten."

11

The record shows Steven in late March 2009 again asked Mullaney to repay the $25,000 because plaintiffs were unable to pay their property taxes that were coming due on their Carmel Valley home and were behind on their credit card payments. Steven testified he did not then consider the sale proceeds from the Spain property to be at risk because he assumed that money was deposited "in a broker's trust account" and they were merely "waiting for that [money] for tax clearance." With interest, Steven estimated Mullaney then owed him about $45,000 as a result of the $25,000 investment/loan. Mullaney told Steven he was in the process of securing a $150,000 loan, and, once secured, he would repay Steven.

The next time Steven asked about the $25,000, Mullaney promised to deposit "some money" into Steven's credit union account. A few days later when Steven complained no money had been deposited, Mullaney stated he was then working "14-hour plus days" and discussed his "investment company."

Steven testified that, in April 2009, he inquired with Mullaney regarding how Steven should "handle" for tax purposes "the reporting of [Mullaney's] commission" from the sale of the Spain property. Mullaney gave Steven a "Post-It note" in response, providing Mullaney received a five percent commission, or $58,900, from the sale of the Spain property and further providing, " '1099 to TGC.' " Steven believed the proceeds from the sale of the Spain property would be distributed to him from the "Trident Global broker trust account" at the end of April 2009, after all the taxes were paid.

12

Although Mullaney had not yet repaid the $25,000, Steven testified that he then still considered Mullaney to be "good friend," a "close teammate" and a "brother." Because of his hectic travel schedule with work and because his mother was ill, Steven next emailed Mullaney in September 2009 regarding payment of the $25,000. In this email, Steven demanded Mullaney pay $50,000 of what Steven then believed was $500,000 owed by Mullaney. Steven testified he estimated he was owed $500,000 based on the sales proceeds from the Spain property that he then believed was still being held in trust by Mullaney, the $25,000 loan/investment he had made in October 2008, which had accrued interest at 7 to 10 percent per month, and the various charges and fees he and his wife Kirsten had accumulated on credit cards and the like that Mullaney all along had agreed to pay. Mullaney did not respond to this email.

Although Mullaney had not repaid the $25,000 or any of the interest due thereon and ostensibly was still holding the proceeds from the sale of the Spain property in a trust account for plaintiffs, Steven in February 2010 asked Mullaney to help them refinance their Carmel Valley home. It appears from the record plaintiffs were then unable to refinance their home. However, they were successful in doing so in March 2011. For the March 2011 refinance, plaintiffs used Loren Uber and CFC. Uber also helped the Eliases refinance their Carmel Valley property in December 2011 and again in or about July 2012, both times using CFC.

Before forming his own company in the summer of 2012, Uber worked with Mullaney at TGC. Uber testified that he began working at TGC in summer 2009; that, in

13

November 2009, he obtained a broker's license issued to TGC; and that in the second half of 2011, he took control of TGC and, ultimately, it became his company after Mullaney's real estate license lapsed. Uber subsequently dissolved TGC and started his own company.

Uber testified that, during an August 2012 meeting, Steven stated that he had invested money in TFHA; that it was in the amount of about $250,000 to $350,000; that, although Uber could not remember the exact sum Steven had invested with Mullaney, Uber described it as "a significant amount"; and that Steven told Uber that Mullaney had not returned the money. Uber also recalled Steven talking about investing money with Mullaney during a March 2011 meeting when they were discussing the Eliases' debt in connection with their refinancing of the Carmel Valley property.

Steven first contacted Conn in April 2011 about Mullaney and the loss of the sale proceeds from the Spain property. Until then, Steven made no contact with anyone at McJab because Steven was "trying to work with [Mullaney]" and he was "trying to protect [his] friend."

Escrow Officer Viloria testified that she opened escrow on the Spain property on receipt of the purchase and sale agreement provided by Mullaney; that she knew Mullaney from previous transactions; and that most of his transactions involved refinancing properties and only a "[v]ery few" involved property sales. Viloria further testified she was not suspicious when she received supplemental wiring instructions from Mullaney because she understood Mullaney was "authorized to act on behalf of

14

[Steven]," inasmuch as Mullaney had opened the escrow and told Viloria he "was helping out his friend." Viloria in response drew up an escrow amendment, which she sent to Mullaney for signature by Steven. Ultimately, the escrow amendment came back signed with what Viloria assumed was Steven's signature.

The escrow status sheet for the Spain property listed "Trident Financial" as the broker's agent. However, the escrow status sheet also stated, "Trident Financial, Jason Mullaney, just advising." Viloria testified Mullaney told her he was "just advising" on the sale of the Spain property and was not receiving a commission. When asked what she meant by "just advising," Viloria testified, "Well, he's [i.e., Mullaney] not getting a commission. He was just helping the seller out." Viloria noted that, in escrow terms, a person who is "just advising" in a transaction also is not the "actual agent on the deal."

The written purchase and sale agreement that Viloria used to open escrow stated the "listing agent" was " 'FSBO.' " Viloria testified that "FSBO" referred to "[f]or sale by owner" and that, in the real estate industry, this meant the seller does not have an agent and is selling the property on his or her own. The purchase and sale agreement also had "FSBO" next to the selling agent, who Viloria noted, represents the buyer. The FSBO reference was repeated on the last page of the purchase and sale agreement, in the box titled " 'Real estate brokers.' "

Plaintiffs in March 2012 sued California Title Company,[3] McJab and its "dbas," Conn and Mullaney. Plaintiffs in their operative complaint alleged causes of action for

---

3    California Title Company is not a party to this appeal.

breach of written and oral contract, negligence, constructive fraud and breach of fiduciary duty. Conn and McJab moved for summary judgment, which plaintiffs opposed. The court granted Conn's motion, but not McJab's.

In connection with McJab's motion, plaintiffs argued among other theories that there was a triable issue of material fact whether the wrongful acts by Mullaney were committed within the course and scope of his agency with McJab. In denying McJab's motion, the court ruled in part as follows:

"The disputed evidence demonstrates that Defendant Jason Mullaney was actively licensed as a real estate sales person under the McJab broker license in 2008, when the transaction occurred. McJab was aware of this continued licensure. Mullaney aided in negotiating the real estate sale on behalf of plaintiffs in 2008. Plaintiffs Steven Elias and Kirsten Elias . . . and Mullaney purportedly agreed that Mullaney would be paid a commission of five [percent] after the sale was consummated. Mullaney represented to Plaintiffs that he was employed by McJab [R]ealty. These disputed facts suggest that Mullaney was operating as a licensed real estate salesperson. Regardless of the representation that the sale was accomplished 'by owner,' there is evidence that Mullaney was engaged as Plaintiffs['] salesperson. Thus, it is also disputed whether he was operating under the broker license at this time such that he was McJab's actual agent."

Before trial, plaintiffs successfully moved to prevent McJab from arguing that Mullaney was not its agent when he assisted in the sale of the Spain property, in light of the fact McJab held Mullaney's real estate license when that escrow closed. However,

16

plaintiffs were unsuccessful in preventing McJab from arguing that Mullaney was acting outside the course and scope of his agency in connection with that sale.  In so doing, the court cogently ruled as follows:

"I'm inclined to direct the jury that Mr. Mullaney was McJab Inc.'s agent.  However -- and this is becoming clearer and clearer as I hear counsel argue their respective positions -- *where the rubber meets the road in this case is whether what Mr. Mullaney did in relationship to the plaintiffs was within the course and scope of his agency*.

"If it was, for example, as *Gi[p]son* [*v. Davis Realty Co.* (1963) 215 Cal.App.2d 190] refers to, to his own end, it sounds to me like the defense has plenty to argue that what he did was not within the course and scope and, therefore, it does not bind McJab, Inc.  That's a jury question.

"Similarly -- or I should say correspondingly, plaintiffs will argue how, if at all, that profited McJab and was certainly within the course and scope and, therefore, does bind McJab, Inc.  *But ultimately, the jury will weigh in on the second of those two elements.  They'll be told Mullaney is McJab Inc.'s agent, but they'll have to decide based upon the totality of the evidence whether what he allege000dly did wrongful was within the course and scope of his agency*."  (Italics added.)

The record shows that, after the presentation of evidence by plaintiffs, the court granted McJab's motion for nonsuit on plaintiffs' breach of oral contract cause of action.  In so doing, the court noted that the principles of vicarious liability arise "out of a tort,

17

not a contract." The court further noted that plaintiffs had not proffered sufficient evidence to show McJab, as opposed to Mullaney, entered into a contract with plaintiffs. As noted, the jury ultimately found Mullaney did not act in the course and scope of his agency in connection with the sale of the Spain property.

DISCUSSION

As both parties recognize, the primary issue on appeal is whether Mullaney was acting within the course and scope of his agency with McJab when he assisted plaintiffs with the sale of the Spain property.

A. *Guiding Principles*

"Under the common law doctrine of respondeat superior, a principal or employer is vicariously liable for the acts of an agent or employee committed in the course of employment [or agency]. (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959–960.)" (*Lathrop v. Healthcare Partners Medical Group.* (2004) 114 Cal.App.4th 1412, 1421, fn. omitted; see *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296 (*Lisa M.*).) The plaintiff bears the burden of proving that the employee's or agent's tortious act was committed within the scope of his or her employment or agency. (See *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 721.) The determination whether an employee or agent has acted within the scope of employment or agency is a question of fact unless the facts are undisputed and " 'no conflicting inferences are possible.' " (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 213 (*Mary M.*).)

18

"Although an employee's willful, malicious, and even criminal torts may fall within the scope of employment, 'an employer is not strictly liable for all actions of its employees during working hours.' (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004 (*Farmers*).) For the employer to be liable for an intentional tort, the employee's act must have a 'causal nexus to the employee's work.' (*Lisa M., supra,* 12 Cal.4th at p. 297.) Courts have used various terms to describe this causal nexus: the incident leading to the injury must be an ' "outgrowth" ' of the employment; the risk of tortious injury must be ' " 'inherent in the working environment' " '; the risk must be ' " 'typical' " ' or ' " 'broadly incidental' " ' to the employer's business; the tort was ' "a generally foreseeable consequence" ' of the employer's business. (*Id.* at pp. 298–299.)

" ' "One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity." ' (*Farmers, supra,* 11 Cal.4th at pp. 1003–1004.) ' " '[F]oreseeability' [in the context of determining scope of employment] [*or agency*] merely means that in the context of the particular enterprise an employee's [*or agent's*] conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." ' (*Id.* at p. 1004, italics omitted.)

"These various terms have been condensed into a two-prong disjunctive test. (*Bailey v. Filco, Inc.* (1996) 48 Cal.App.4th 1552, 1559; see *id.* at p. 1561 ['the two-prong test is substantively similar to the foreseeability-based test'].) The conduct of an employee falls within the scope of his or her employment if the conduct either (1) is

19

required by or incidental to the employee's duties, or (2) it is reasonably foreseeable in light of the employer's business. (*Id.* at p. 1559; see CACI No. 3720.)"[4] (*Montague v. AMN Healthcare, Inc.* (2014) 223 CalApp.4th 1515, 1521.)

B. *Analysis*

As a threshold matter, we conclude the determination whether Mullaney was acting within the scope of his agency when he assisted plaintiffs with the sale of the Spain property was a question for the jury. (See *Mary M.*, *supra*, 54 Cal.3d at p. 213.) We thus conclude the trial court was correct in allowing the jury to hear all the evidence and decide whether Mullaney was acting within the course and scope of the agency for purposes of imposing vicarious liability on McJab. (See *ibid.*)

As such, we reject plaintiffs' contention that the "course and scope" issue should have been decided as a *matter of law*, either because of the "public policy" underlying the real estate laws or because Mullaney was licensed as a real estate agent and then *may* have been engaging in *some* activity or activities for which a license was required.[5] To

---

[4]    Insertions added by this court are placed in brackets and italicized to distinguish them from the bracketed insertions appearing in the original material.

[5]    We say *may* and *some* because there is evidence in the record to support the finding that Mullaney was merely "advising" a "friend" (i.e., Steven) in connection with the sale of the Spain property; that Steven himself listed the property for sale while his sister sat at the open house; that, at the time of the sale of the Spain property, Mullaney was working "full time" in developing his own separate businesses involved in hard-money lending, which Steven had invested in; and that, as such, Mullaney may not have been engaging in an activity or activities for which a real estate license was required when he assisted in the sale of the Spain property and committed the wrongful conduct.

20

adopt the rule suggested by plaintiffs would make a principal strictly liable for an agent's wrongful conduct, which we decline to do.

We further conclude our standard of review of the jury's determination of course and scope is substantial evidence, inasmuch as there were both myriad disputed facts and conflicting inferences based upon such facts with respect to this issue, as the trial court correctly noted in denying both McJab's summary judgment motion and plaintiffs' pretrial motion to prevent McJab from offering evidence to show Mullaney was acting outside the course and scope of his agency.

For example, there was a factual dispute regarding whether Mullaney's misappropriation of the sale proceeds of the Spain property (i.e., the wrongful conduct) in June 2008 was an "outgrowth" of, or "broadly incidental" to, his agency with McJab where he had once worked as a licensed real estate agent (see *Lisa M., supra,* 12 Cal.4th at p. 297), on the one hand, or was a risk outside that agency in light of the evidence Mullaney had left McJab six months earlier to pursue "full time" his own hard-money lending business through TGC and TFHA, which business or businesses Steven had invested in both before and after the sale of the Spain property, on the other hand.

The record also discloses a factual dispute regarding whether Steven *invested* some or all of the sale proceeds from the Spain property with Mullaney, or whether Mullaney was allegedly just holding these proceeds in a "trust account" for plaintiffs as Steven testified. In our view, this question was relevant to the course and scope issue because *if* Steven invested those proceeds with Mullaney in anticipation of receiving up

21

to a 24 percent return, such activity arguably would not be an outgrowth of, or broadly incidental to, Mullaney's agency with McJab or to McJab's enterprise of offering loan originations and engaging in real estate sales. (See *Lisa M.*, *supra*, 12 Cal.4th at pp. 298-299.)

Although Steven testified he did not invest any money from the sale of the Spain property with Mullaney, he admitted discussing such an investment with Mullaney even before escrow closed. What's more, Uber testified that, during a meeting in 2012, Steven admitted to investing and losing between $250,000 to $350,000 in Mullaney's businesses. When coupled with the evidence that Steven already had invested money with Mullaney both before escrow closed and shortly thereafter, we conclude there was a factual dispute regarding whether Mullaney was engaging in activities that were related to the enterprise undertaken by McJab at the time he committed the misconduct.

In sum, we conclude the issue of whether Mullaney was acting within the course and scope of his agency with McJab when he assisted Steven with the sale of the Spain property was a question of fact for the jury, and our review of that determination is based on substantial evidence. We turn now to the issue of whether substantial evidence supports the jury's finding Mullaney was acting outside the scope of his agency with McJab.

In analyzing this issue, we recognize that the "power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when

two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 (*Bowers*).) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid*.; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.)

Applying the substantial evidence standard of review in this case, we conclude there is sufficient evidence in the record to support the finding of the jury that Mullaney was not acting within the course and scope of his agency with McJab when he assisted plaintiffs with the sale of the Spain property and misappropriated the proceeds from that sale. The record shows that, about six *months* before Mullaney assisted in the sale of the Spain property, he told Smyth he was leaving McJab and was going into hedge funds; that, before Mullaney assisted plaintiffs in the sale of the Spain property, he also told Steven he was leaving McJab to do hard-money loans; that, at the time Mullaney left McJab in December 2007, the real estate market had become "terrible"; that, before Mullaney assisted in the sale and engaged in the misconduct, Steven already had invested $40,000 in Mullaney's hard-lending business, receiving a return of between 7 to 10 percent interest on that investment; that Mullaney had explained to Steven what the hard-lending business entailed, which included, among other requirements, that the borrower own the asset "free and clear"; that, even before escrow closed, Steven and Mullaney

23

spoke about Steven investing a portion of the sale proceeds from the Spain property in Mullaney's hard-lending business; that after escrow closed and Mullaney was allegedly holding the sale proceeds from the Spain property in a "trust account" for Steven, Steven transferred $25,000 to Mullaney with the expectation he would receive a 7 to 10 percent return within 30 days on that money; that Steven, on the one hand, and Mullaney on behalf of McJab, on the other hand, executed a document titled "Confirmation Real Estate Agency Relationships" in connection with the *purchase* of the Spain property in 2007, but that no such document was executed by Steven and Mullaney in connection with the *sale* of the property in 2008; that Mullaney recommended against listing the Spain property on the MLS, which listing service Smyth checked about once a week using an agent's—including Mullaney's—MLS number to track listings and ensure their accuracy; that Steven himself put a "for sale" sign in the front of the Spain property and his sister sat at the open house, as Mullaney had advised; that Mullaney engaged in criminal conduct—forgery—when he signed and initialed Steven's name on multiple documents in connection with the sale of the Spain property, including the residential purchase and sale agreement, the " 'Buyer's Inspection Advisory,' " the " 'Wood Destroying Pest Inspection and Allocation of Cost Addendum' " and the supplemental escrow instructions that led to the sale proceeds from the Spain property being wired directly into Mullaney's personal account; that, after Mullaney left McJab in December 2007, Mullaney did not engage in activities that required a real estate license—with

24

*perhaps*[6] the exception of the sale of the Spain property—until late 2009 or early 2010; that McJab first learned about Mullaney's wrongful conduct in April 2011, almost *three years* after Mullaney misappropriated the sale proceeds from the Spain property; that Steven waited to contact McJab, including Conn and/or Smyth, about Mullaney's misconduct because Steven was "trying to work with Jason [Mullaney]" and because he wanted to "protect" Mullaney; and that Steven, among other investors, lost significant money while investing with Mullaney, which ostensibly involved considerable risk.

That the record contains evidence that would have supported a contrary finding, namely that Mullaney was acting in the course and scope of his agency with McJab when he assisted Steven with the sale of the Spain property in June 2008, does not change our conclusion. (See *Bowers*, *supra*, 150 Cal.App.3d at p. 874; see also *Milton v. Perceptual Dev. Corp.* (1997) 53 Cal.App.4th 861, 867 [noting that "[i]f the evidence gives rise to conflicting inferences, one of which supports the trial court's [or jury's] findings, we must affirm"].) Because substantial evidence in the record supports the jury's finding in this case, we must affirm.

---

6      See footnote 5, *ante.*

## DISPOSITION

The judgment in favor of McJab is affirmed.  Each party to bear its own costs of appeal.  (See Cal. Rules of Court, rule 8.278(a)(5).)


                                                            BENKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

26